# Supreme Court of the Navajo Nation

**In the Matter of the Estate of:**
**Mae G. Howard**
**Alberta Beardsley, Administratrix/Appellant,**
v.
**Elvira R. Blackman, Intervenor/Appellee.**
**Decided May 28, 1997**

## OPINION

Before YAZZIE, Chief Justice, AUSTIN and CADMAN, Associate Justices.

John A. Chapela, Esq., Window Rock, Navajo Nation (Arizona), for the Appellant; and William P. Battles, Esq., Window Rock, Navajo Nation (Arizona), for the Appellee.

Opinion delivered by CADMAN, Associate Justice.

This is an appeal of a final order and judgment of the Window Rock Family Court which declared an oral will and distributed the decedent's house to an intervenor-claimant. The dispositive issues on appeal are these: 1) whether the decedent in this probate made a traditional Navajo oral will which should be recognized and enforced; and 2) whether the family court erred in relying upon statements made by the probate administratrix to the intervenor after the decedent's death.

I

Mae G. Howard died on August 31, 1991. She was a 75 year-old widow with a daughter, Alberta Beardsley, and two grandsons by a deceased daughter. Elvira Rose Blackman, the decedent's niece, was the only relative who lived with Howard at her house in the St. Michael's housing subdivision in Window Rock, Navajo Nation. Blackman lived with Howard as a "renter" for two years prior to Howard's death.

Beardsley filed a petition for the probate of an intestate estate, naming herself, Alyce Howard (the deceased daughter), and Alyce Howard's two sons, Chris Begay and Wilbert Keedah Jr., as the heirs. The estate inventory did not list Howard's house as an asset of the estate. At the time of the final hearing on March 20, 1995, Blackman sought to intervene, claiming that the inclusion of the house in a decree of distribution would violate an oral will made by Howard prior

to her death. Given that the home was not included in the inventory, Beardsley orally amended the inventory to include the house. The court continued the final hearing to receive testimony on the asserted oral will.

At the hearing, Blackman testified that she rented a bedroom in Howard's house for two years prior to her death. At no time did Howard tell her she would get the house. Blackman testified that during a conversation with Beardsley shortly after Howard's death, Beardsley told her that Howard expressed a desire that she "have the house." Beardsley denied any such conversation with Howard and said she did not recall making such a statement to Blackman.

Blackman offered a secretly recorded tape recording of an August 22, 1992 telephone conversation with Beardsley where she appeared to acknowledge that Howard wanted Blackman to have the house. The transcription of the tape appears to show that Beardsley wanted to avoid the oral will "[b]ecause it's not legal," or claimed that while "grandma wanted you to have the house," she "changed her mind." The court received the tape as evidence to impeach Beardsley's denial despite her objections.

Beardsley's conversation with Howard prior to her death, if it took place, was one between a decedent and her only child. Blackman was not privy to the conversation and she stated she did not learn of it until after Howard's death. The surviving children of the decedent's other daughter were not present for the alleged oral will.

Based upon the testimony, the Window Rock Family Court concluded that the decedent "gave her only surviving child ... instructions to the effect that she wanted the Intervenor [Blackman] to receive her personal home in the event of her death"; that the daughter conveyed those wishes to Blackman; and that Blackman relied upon those representations. Using these findings, plus our prior decisions on oral wills, the family court found the existence of an oral will and "awarded the permanent, sole and exclusive possession and ownership" of the house to Blackman, "with immediate and continuing rights of occupancy and use." Beardsley appeals.

## II

As a preliminary matter, we reject the contention that the October 16, 1995 family court judgment was not a "final judgment" for purposes of appeal. That judgment actually awarded "the permanent, sole and exclusive possession and ownership" of a distinct item of estate property to Blackman. Therefore, the judgment is final and this appeal is proper.

## III

The Navajo common law of the "oral will" is troublesome. An oral will is a lifetime statement of a decedent's wishes on the disposition of his or her property after death. English-American common law addressed problems of fraud, con-

tention, and the reliability of hearsay statements of a decedent's oral wishes by requiring that wills be in writing and witnessed (with the exception of holographic wills). Our courts rejected the English-American rule, as they have the authority to do, in favor of honoring the wishes of Navajos in accordance with ancient custom. The oral will is a time-honored Navajo practice and the People expect their courts to acknowledge and enforce it in modern probate proceedings.

The former Navajo Court of Indian Offenses recognized and enforced oral wills in its decisions. Barsh, *Navajo Tribal Courts, Property and Probate Law,* 1940-1972, 6 *Law and Anthropology* 169, 183 (1991).[1] This Court has struggled to frame rules for the reception of oral wills in probates, and a review of past decisions is relevant to the case before us.

The first reported oral will decision is *Estate of Lee,* 1 Nav. R. 27 (1971). In that case, the decedent's brother moved to reopen an intestate estate to assert an oral will. The discussion that was asserted as an oral will took place among the decedent, his three brothers (including the claimant), and the mother of all four. *Id.* at 30-31. The Court found that "[a]lthough their statements generally agree, we do not consider that the statements made are strong enough to prove an actual will of the land to petitioner." *Id.* at 31. The Court acknowledged will-making under the general American rule and the Navajo Nation statute (8 N.T.C. Sec. 3), both of which require a written and witnessed will, but stated the rule that:

> It is a well established custom that a Navajo may orally state who shall have his property after his death when all of his immediate family are present and agree and that such a division will be honored after his death. We know of no other custom in this respect. We hold, therefore, that unless all of the members of his immediate family are present and agree [a] Navajo cannot make an oral will....

*Id.* at 31-32.

The Court revisited the issue of what it takes to make an oral will in *Estate of Benally,* 1 Nav. R. 219 (1978). There, the decedent orally devised his grazing permit to his wife in the presence of the wife and their four children. *Id.* at 220. The problem was the decedent's four children by a first marriage were not present at the discussion, and they claimed their portion of the estate as members of the "immediate family." *Id.* After examining state case definitions of "immediate family," and noting that the definition requires "living together in the same household" or being "members of the same household," the Court concluded as follows: "We adopt the rule that the children of the decedent's first marriage, who were not living with the decedent when he died, are not members of the immediate family for the purpose of an oral will." *Id.* at 222-223 (citations omitted). The Court explained its reasons to modify the test:

1. Barsh's review of Navajo Nation probate decisions was funded by the Kennedy Institute of Politics and approved by Chief Justice Virgil Kirk. The published article is a revision of an original report to the Judicial Branch of the Navajo Nation.

> We are limiting this rule on the immediate family to cases involving oral wills because the Court is mindful of the Navajo concept of the extended family. This rule is adopted because it would work too great a hardship on the Navajo People to require the presence of all who might be considered immediate family by the Navajo extended family concept. Since many Navajo[s] cannot write, cannot afford to have an attorney write a will and do not understand the concept of a written will, [it] is important that there be some alternate method by which a person may devise his property.

*Id.* at 223. The Court found that the will was made in the presence of the decedent's wife and the children of the marriage, and, lacking evidence of "disagreement among members of the immediate family," there was a valid oral will. *Id.* The Court also rejected an objection to testimony about an oral will as a violation of the "Dead Man's Act" and declined to adopt that rule of law for the Navajo Nation. *Id.* at 224.

Former Chief Justice Tom Tso also discussed the "immediate family" definition in *Estate of Apachee*, 4 Nav. R. 178, 183 (Window Rock D. Ct. 1983). There, he found that the "immediate family" consisted of the decedent and his mother, father, and three sisters, with whom he lived: "They would logically belong to the 'immediate family' because of the close ties of blood, but more importantly, because of the mutual assistance and support they gave to each other." *Id.* at 183. There was also a minor child who was in the custody of his mother following a divorce. *Id.* at 178. The Court found that the child "is also a logical member of the 'immediate family' because he was 'born for' his father's clan and is in need of assistance." *Id.* at 183. Judge Tso reasoned that "the object of Navajo common law probate is to benefit the camp or residence group as a unit in the case of productive property and to benefit those living together and those in need in the case of nonproductive property." *Id.* This was not an oral will case, but one where the court interpreted the term immediate family to determine heirs in intestacy. *Id.* at 179.

The struggle with oral wills continued in *Estate of Thomas*, 6 Nav. R. 51 (1988), See also *Estate of Thomas*, 5 Nav. R. 232 (Window Rock D. Ct. 1986) (the district court's decision was reversed on appeal). There, the Court found that the decedent had eight adult children and the alleged oral will was made in the presence of two children who lived in the same camp or household, but not in the presence of other children who lived nearby in the same community and in Gallup and Tohatchi. The Court clarified the "immediate family rule" to require "that all children of the testator, including the spouse if alive, must be present in order for an oral will to be valid." *Id.* The court overruled the definition of immediate family as including only those children who resided with the decedent in favor of a rule which requires the presence of all children and a surviving spouse. *Id.* at 53. The court reasoned that a rule which permits a decedent "to essentially eliminate from the immediate family those children of the testator who do not reside under the same roof as the testator" as "inconsistent with the Navajo custom which teaches that parents should view each of their children equally." *Id.* at 54. With this background, we now turn to the issues at hand.

## IV

### A

At the outset, this Court reaffirms the policy of the Navajo Nation courts, which most likely dates to their inception in 1892 as the Navajo Court of Indian Offenses, to honor the traditions and practices of the Navajo People. The oral will is too entrenched in the values of the Navajo People to abandon now. We acknowledge, however, the complexities of translating an ancient Navajo customary practice into a rule to be applied in modern adjudication. While one of the fictions which underlies English common law, American common law, and Navajo common law is that judges do nothing more than articulate the customs and traditions of their peoples to "find" the law rather than "declare" it, the process is difficult.

Here, we deal with a custom where a Navajo makes a living declaration of what he or she wants done with property after death and that the heirs will normally honor and obey that wish. That kind of dynamic comes to the courts in situations where heirs and others disagree about the "wishes" of a decedent. That forces us to search for a rule of reliability, an evidentiary means, to find the wishes of a decedent when making a decision in contested adjudication.

The existence or not of an oral will should be decided by family members on their own or in peacemaking. If that is not possible, the case will go to adjudication for a decision based on the reliability of an asserted oral will to find the wishes it expresses. We will examine the facts of this case to determine Howard's wishes and whether Blackman proved the existence of those wishes as an oral will.

### B

This is a case about an elderly woman who lived in a modern home in a contemporary subdivision of the Capital of the Navajo Nation at Window Rock. She owned a modern house or *kin*. She did not live in a sheep camp or hogan situated in a rural area. She had no spouse. Only one of her children was living, but that child did not live with her. Her grandchildren by a deceased daughter did not live with her. The only relative who lived with her was Blackman, her niece, whom the Court found was an "occupant" of the house and the testimony described as a "renter." That is important, because prior decisions have considered the interdependence and common efforts of members of a residence to its maintenance and that of a decedent as a factor.

In this case, the decedent, Howard, purportedly made her declaration of intent to her only daughter, Beardsley, that the co-resident niece, Blackman, should have her house outside the presence of the niece. The beneficiary of the testamentary gift was not present at that discussion. That alone does not meet the requirement of reliability, particularly when the beneficiary resided in the same house with the decedent.

Circumstantial evidence may support an oral will and in this case we look at that evidence, developed following the decedent's death, to see if there was in fact an oral will. The house was not listed in the original inventory and that might be interpreted as Beardsley's understanding that there was an oral will and that she was carrying out her mother's wishes by assuming it passed under the oral will. However, the record reflects that the house was later added in the amended inventory. Beardsley's statement against interest to Blackman (that the deceased wanted her to have the house), if credible in light of the demeanor of the parties, might provide further circumstantial confirmation. However, Beardsley presented testimony denying she ever made that statement against interest. Blackman then introduced a tape recording to bolster her position that Beardsley did make the statement and to impeach Beardsley's denial. Apparently, the court placed great weight on the tape recording to find an oral will and we deal with that now.

This Court is free to interpret rules of evidence in light of Navajo common law. This Court did so in *Estate of Benally*, 1 Nav. R. at 224, when it rejected the "Dead Man's Act" which prohibits the receipt of hearsay declarations by a decedent. If we are to honor the oral will as a principle of Navajo common law, non-Navajo rules of evidence will not stand in the way.

The foundations of rules of evidence are reliability and public policy. In this case, a claimant (Blackman) sought to reinforce her claim by making a telephone call to a competing claimant (Beardsley) who was also the administratrix of the estate with responsibilities to other potential heirs. The call was secretly taped, without the knowledge and consent of Beardsley, by an investigator for Blackman's attorney.[2] The policy issue is whether the Navajo Nation courts should receive such evidence, either as direct evidence or as impeachment testimony.

Generally, under Navajo common law, information is property. A person's words are property. Taping them in a clandestine manner and without the knowledge and consent of the speaker is a form of theft. It is deceit. Despite any other rule governing telephonic or other electronic communications where a sender does not know a recipient or third person is recording the communication, we hold that as a matter of policy, framed by Navajo common law, the Navajo Nation courts will not receive recordings of electronic communications if they are made without the knowledge and consent of a speaker or sender or other legal authorization. We conclude that the Window Rock Family Court erred in receiving the tape and its transcript into evidence and relying on it to rule in favor of an oral will.

---

2. At oral argument, the Court asked both attorneys if the administratrix was represented by counsel at the time, because a call initiated by counsel for one opposing party could violate the prohibition against direct attorney contact with another opposing party. The attorneys gave conflicting answers.

We find it relevant that this decedent made her declaration to a daughter who did not live in the same house regarding an intended beneficiary who did live in the same house. There was no showing that the declaration was repeated on any other occasion or otherwise acted upon, within the claimant's presence or that of any other relative, associate of the decedent, or associate of the daughter. The trial court's conclusion that it was more likely than not that there was an oral will, based upon a one-time discussion between a mother and daughter and without indications of reliability which occurred during the decedent's lifetime, was in error. While it is logical to expect that an elderly woman would discuss her affairs and desires with a daughter, it is not logical to conclude that the conversation either took place or reflected the firm will of the decedent without any other indicator of reliability. Even if the tape and its transcript were not contrary to public policy, we note that the daughter-administratrix against whom it was used also asserted that the decedent changed her mind. That fact defeats the telephone conversation as an indicator of reliability.

## V

Finally, we see a need to say something on the "immediate family" rule. In a case such as the one before us, we see problems with attempting to find an oral will where the decedent makes his or her last wishes known only to the sole surviving heir. There is a potential that the sole surviving heir may not follow through on the decedent's wishes. For that reason, we suggest that another person witness the discussion that form the basis of the decedent's final declarations.

We are aware that this Court's prior decisions on the "immediate family" rule appear to make up wills for decedents rather than ascertaining the decedents' exact wishes and whether those expressions were reliable. However, we also see the potential for abuse and those concerns were raised at oral argument. There may be instances where a decedent expresses wishes outside the presence of a logical heir or intended beneficiary or expresses wishes to exclude someone who otherwise might seem to be a logical heir. These matters and others related to the "immediate family" rule, we will leave for another day.

## VI

We conclude there is no oral will. Therefore, the decision of the Window Rock Family Court is reversed. The family court shall conduct proceedings which are consistent with this opinion.